IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 25, 2005

## JERRY ALLEN MILLSAPS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Monroe County**
**No. 01-232     Carroll L. Ross, Judge**

────────────

**No. E2004-01181-CCA-R3-PC - Filed March 30, 2005**

────────────

The petitioner, Jerry Allen Millsaps, challenged his 1998 Monroe County Criminal Court jury conviction of first degree murder via filing the October 1, 2001 post-conviction relief proceeding now under review. The post-conviction court conducted an evidentiary hearing and dismissed the post-conviction petition. On appeal, the petitioner claims that the conviction was the result of ineffective assistance of counsel and that the post-conviction court erred in dismissing the petition. We disagree and affirm the dismissal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., joined. JAMES CURWOOD WITT, JR., J., not participating.

R. Joshua McKee, Athens, Tennessee, for the Appellant, Jerry Allen Millsaps.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Chal Thompson and Bill Reedy, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

In the petitioner's direct appeal, this court affirmed his conviction and sentence of life without the possibility of parole. See State v. Millsaps, 30 S.W.3d 364 (Tenn. Crim. App. 2000). This court's opinion in Millsaps provides a concise review of the facts of the underlying premeditated murder case:

> The [petitioner] was a bartender at the Log Barn Bar in
> Monroe County, and the victim was a regular patron at the Bar.
> Testimony at trial revealed the two had a continued history of

animosity. Testimony from the state's witnesses revealed that prior to the night of the murder, the victim and the [petitioner] argued over the victim's accusations that [the petitioner] was providing marijuana to one of the victim's employees and that [the petitioner] had stolen money from a patron at the bar.

Bill Barr, a patron of the Log Barn, described an incident three weeks before the homicide in which the [petitioner] attempted to shake the victim's hand and the victim refused, stating "I won't shake hands with no son of a bitch that hollers and shouts at me." Barr also testified that on January 21, 1997, the night of the murder, [the petitioner] indicated he was "about over this shit," referring to the victim and his family. Fifteen minutes after this statement, [the petitioner] purchased a pistol from Barr.

Shortly thereafter, [the petitioner] and the victim entered into a verbal altercation in which the [petitioner] accused the victim of trying to "start shit." The [petitioner] knocked the victim to the floor and began choking him. Barr testified that the [petitioner] "had his knees in the victim's shoulder blades, choking him with both hands," and the victim was unable to move or defend himself. Barr then attempted to extricate the [petitioner] from the victim, stating '"please, don't kill him." The [petitioner] told him to "get the hell out." Barr started to leave and the [petitioner's] wife begged him to stay, asking him "what am I going to do?". Barr left the establishment, responding '"I don't give a damn what you do; I'm leaving."

[The petitioner] testified that after Barr left, there was a lull in the fighting. He claims he left the room and, upon his return, noticed the victim had a knife. A subsequent altercation ensued during which the victim was thrown against the brick floor and strangled until he ceased movement. Upon realizing the victim was dead, the [petitioner] shut off the lights in the bar, locked the doors and drug the victim's body into an adjoining room.

The [petitioner] showered and changed his clothes. He placed his clothes and the victim's personal items into the wood burning stove, moved the body to the outside of the building, and covered it with garbage bags. He then went to bed. The next morning [the petitioner] moved the victim's vehicle from the bar parking lot to the main road. He then transported the victim's body to his mother's

property and buried it underneath an abandoned outhouse. The body was found approximately two weeks later.

Steve Dotson testified that the day after the murder the [petitioner] stated that the "troubles at the Log Barn are over . . . [h]e's cut up and burnt and they'll never find the body." In addition Barr testified that later that day [the petitioner] asked him to tell authorities that he was the last one to leave the Log Barn on the night of the murder.

Soon after the victim's disappearance and prior to finding his body, [the petitioner] was interviewed by law enforcement authorities. He gave two separate written statements. In the first statement, he said there was no altercation at the bar; the victim left the bar; and he never returned. In the second statement [the petitioner] said he had a "fight" with the victim; the victim left the bar; and the victim never returned. At no time did the [petitioner] ever mention that the victim had a knife.

[The petitioner] was found guilty of first degree murder and sentenced to life in prison without the possibility of parole.

Id. at 367-68 (footnote omitted).

On appeal, the petitioner raises the following issues of ineffective assistance of counsel:

(1) Failure to investigate and interview witnesses whose names and addresses were provided by the petitioner, and

(2) Failure to present and/or cross-examine witnesses to show the victim's threats against the petitioner, his reputation for violence, and specific instances of the victim's acts of violence.

At the evidentiary hearing, the petitioner testified that his trial counsel failed to call Cecil Barefield and Bryan Burns as trial witnesses. The petitioner claimed the testimony of Barefield and Burns would have helped him "to show the character the [victim], and some of the situation that was leading up to this fight." The petitioner testified that the victim had threatened to kill him and to burn down the Log Barn Bar, where the petitioner worked and lived.

The petitioner testified that his trial counsel assumed the defense duties upon the onset of illness of the original attorney. Despite trial counsel announcing to the court at the beginning of the trial that he was not prepared to proceed, trial counsel did not move for a continuance.

The petitioner testified that trial counsel failed to move for pretrial discovery and failed to demand the production of exculpatory evidence. He claimed that counsel failed to object on grounds of irrelevancy to the introduction of a pistol at trial and failed to adequately cross-examine State witnesses David Bryan and Bill Barr.

Cecil Barefield testified at the evidentiary hearing that he had known the petitioner for twenty-five years and that he was present in the Log Barn Bar three or four hours before the victim's death. Barefield testified that the petitioner and the victim were having an argument and that the petitioner told the victim, "I've had enough. Why don't you go bother somebody else and leave me alone awhile?" Barefield testified that defense counsel never contacted him about the case, but he was uncertain whether an investigator had spoken with him.

Brian Burns testified that he knew both the petitioner and the victim and recognized friction between them. He stated that the victim would "say something smart, you know. Some people might take it smart and some people might not . . . , but he was extra smart" with the petitioner, "aggravating like." Burns testified that the victim threatened to "burn[ the petitioner] out" and told the petitioner, "That was his hollow," referring to the location of the Log Barn. The friction between the petitioner and victim "went on for a period of years." Burns testified that he had never been contacted by anyone about the case.

The petitioner's trial counsel testified that he had no recollection of knowing about Barefield as a potential witness. He believed that an associate attorney of his interviewed Burns, but the interview resulted only in information that the victim's son had fired a gun into Burns' home. Counsel testified that he had a list of names of potential witnesses although he was not sure whether the petitioner had provided the list. He told the petitioner, "We've got a witness problem." He elaborated that the witnesses whose names he had been given were either uncooperative or could not be located. He recalled that Burns' name was on the list. Counsel acknowledged that if Burns had offered the specific information about the victim's threats against the defendant that he presented in the evidentiary hearing, he would have called him to testify at trial.

Counsel testified that he had a difficult time finding witnesses who would testify to the victim's "bad character." Although at trial the State called the victim's ex-wife to testify about the victim's good character, counsel opted "as a matter of . . . intuition" not to cross-examine her. He decided at the time that it would have been disingenuous to "jump on [the] victim . . . [o]r the widow of a victim."

Counsel testified that he was unable to find any witness other than the petitioner. He acknowledged that, in his opinion, "the jury went overboard." He commented, "I thought it was a manslaughter case, and I think if [the petitioner] had not disposed of the body where he did, I think it would probably have been manslaughter." He added that the disposing of the body in an abandoned outhouse "didn't . . . sound good before the jury." Trial counsel further testified, "I was not carefree about the case at all. The case worried me, and I did the best I could. . . . Put a lot of thought and time into it."

Following the evidentiary hearing, the post-conviction court took the case under advisement and rendered a written finding of facts and an extensive order dismissing the petition. The court recounted that there were no witnesses to the homicide and that trial counsel had been unable to locate favorable witnesses who could depict the relationship between the petitioner and the victim. The post-conviction judge, who had also presided over the petitioner's trial, stated that, to the jury, the petitioner's furtive actions following the homicide belied the claim of self-defense. The judge stated that the testimony of Barefield and Burns in the evidentiary hearing, if presented at trial, could have as easily offered a motive for the homicide as a predicate for a finding of self-defense. Ultimately, the court concluded, "There has been no showing in this case that the representation by counsel was not within the required 'range of competency' demanded by Strickland [v. Washington]."

## II. Analysis

In post-conviction proceedings, the petitioner has the burden of proving by clear and convincing evidence the claims raised. Tenn. Code Ann. § 40-30-110(f) (2003). On appeal, the lower court's findings of fact are reviewed de novo with a presumption of correctness that may only be overcome if the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

When a petitioner challenges the effective assistance of counsel, he has the burden of establishing (1) deficient representation and (2) prejudice resulting from that deficiency. See Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Deficient representation occurs when counsel's services fall below the range of competence demanded of attorneys in criminal cases. See Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991). Prejudice is the reasonable likelihood that, but for deficient representation, the outcome of the proceedings would have been different. See Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994). Courts need not address both Strickland components in any particular order or even address both if the petitioner fails to meet his burden with respect to one. See Henley v. State, 960 S.W.2d 573, 580 (Tenn. 1997). On review, there is a strong presumption of satisfactory representation. See Barr v. State, 910 S.W.2d 462, 464 (Tenn. Crim. App. 1995).

In evaluating counsel's performance, this court should not examine every allegedly deficient act or omission in isolation, but rather we view the performance in the context of the case as a whole. State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The primary concern of the court should be the fundamental fairness of the proceeding being challenged. Id. Therefore, this court should not second-guess tactical and strategic decisions of defense counsel. See Henley, 960 S.W.2d at 579. Instead, this court must reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's perspective at the time. Id.; see also Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). A court must

> "consider the totality of the evidence before the judge or jury. Some
> of the factual findings will have been unaffected by the errors, and

factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated trivial effect. . . ."

Henley, 960 S.W.2d at 580 (quoting Strickland, 466 U.S. at 696-97, 104 S. Ct. at 2069).

On appeal, the petitioner first claims that his trial counsel was ineffective in failing to conduct a full investigation and in failing to call witnesses, including Barefield and Burns. The record in no way illustrates how counsel's performance was deficient in generally investigating the case. The petitioner provided no clear and convincing proof that counsel failed to perform any investigative tasks, especially in light of trial counsel's accredited testimony that he made a diligent, though futile, effort to locate favorable witnesses. In any event, the record evinces no showing that more investigation of a general nature would have benefitted the defense. Regarding investigation in the form of seeking and calling witnesses, the petitioner's bare allegation that favorable witnesses were available is inadequate. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing"; otherwise, the petitioner is entitled to no relief. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As to the two potential trial witnesses who did testify at trial, namely Barefield and Burns, the post-conviction court found an absence of efficacy to their testimony. The court said that the witnesses' testimony could have demonstrated a motive for the homicide as easily as it could have advanced a self-defense theory.

We conclude that, even if trial counsel had performed deficiently in not locating and utilizing Barefield and Burns at trial, their testimony does not cause us to lose confidence in the fair outcome of the trial proceeding. Even if both men had testified at trial in line with their testimony at the post-conviction hearing, we are unconvinced that the evidence thereby presented would have had any impact on the verdict. We agree that the petitioner's claim of self-defense was seriously belied by the petitioner's actions in burning the victim's personal effects and in disposing of his body in an abandoned outdoor toilet, as well by his apparently belated attempt to claim that the victim pulled a knife during the altercation.

In his other appellate issue, the petitioner asserts that his trial counsel was ineffective in failing to present witnesses who could have advanced the petitioner's claim that the victim was the first aggressor and in failing to cross-examine the victim's ex-wife to establish this claim. In his brief, the petitioner specifically posits that counsel should have used both direct testimony and cross-examination of the victim's ex-wife to show both the victim's reputation for violence and specific acts of the victim that suggest a violent disposition.

In the evidentiary hearing, however, the petitioner failed to show that any such direct or cross-examination would have yielded any evidence of the victim's violent reputation or disposition. Burns testified at the evidentiary hearing that the victim verbally threatened to burn the petitioner "out," but Burns offered neither an opinion as to the victim's violent reputation nor any specific

instances of the victim's violent behavior.  No other witness testified at the evidentiary hearing in support of the claim of a violent reputation or of prior violent acts.  The failure to present such proof defeats the petitioner's claim.  <u>See</u> <u>Black</u>, 794 S.W.2d at 757.

### III.  Conclusion

For the foregoing reasons, we affirm the judgment of the post-conviction court.

_____

NORMA MCGEE OGLE, JUDGE